IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ELIZABETH W. COLGAN )
)
         Plaintiff, )
)
vs. ) Case No. 17-cv-678-JPG-CJP
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
         Defendant. )

## MEMORANDUM AND ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Elizabeth W. Colgan seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for DIB on September 1, 2011, alleging a disability onset date of June 1, 2005. (Tr. 156-60.) The agency denied her application at the initial level and again upon reconsideration. (Tr. 90-92.) Plaintiff requested an evidentiary hearing, which Administrative Law Judge (ALJ) Karen Sayon conducted in October 2013. (Tr. 41-89.) ALJ Sayon issued an unfavorable decision thereafter. (Tr. 14-40.) The Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final agency decision. (Tr. 1-7.) Plaintiff exhausted her administrative remedies and filed a timely Complaint in this Court in March 2015. (Tr. 1222-32.) The Court reversed the Commissioner's decision denying plaintiff's application for benefits and remanded the application to the Commissioner for rehearing and reconsideration of the evidence. (Tr. 1276-1307.)

While plaintiff's appeal was pending before this Court, she filed a subsequent application

for DIB dated June 18, 2015, along with an application for SSI dated October 27, 2015. The agency denied these applications at the initial level and again upon reconsideration. Plaintiff requested a hearing. The Appeals Council found the subsequent claims duplicate and ordered the ALJ to consolidate all of plaintiff's claims for remand. (Tr. 1310.)

In January 2017, pursuant to an order from this Court, ALJ Michael Scurry conducted an evidentiary hearing. (Tr. 1139-87.) ALJ Scurry issued a partially favorable decision in February 2017; he found plaintiff became disabled on June 6, 2016. (Tr. 1100-38.) Plaintiff did not seek review with the Appeals Council and the Appeals Council did not take jurisdiction. The ALJ's decision therefore became the final agency decision. Plaintiff filed a timely Complaint in this Court. (Doc. 1).

## Issued Raised by Plaintiff

Plaintiff argues the ALJ erred in weighing the medical opinions in the record; erroneously evaluated plaintiff's subjective complaints; and improperly based his decision on unreliable vocational expert (VE) testimony.

## Applicable Legal Standards

To qualify for benefits, a claimant must be "disabled" pursuant to the Social Security Act. The Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[1] The physical or mental impairment must result

---

[1] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423 *et seq.* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c *et seq.* and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, which details medical considerations relevant to an

from a medically demonstrable abnormality. 42 U.S.C. § 423(d)(3). Moreover, the impairment must prevent the plaintiff from engaging in significant physical or mental work activity done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations require an ALJ to ask five questions when determining whether a claimant is disabled. The first three questions are simple: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe physical or mental impairment; and (3) whether that impairment meets or is equivalent to one of the listed impairments that the regulations acknowledge to be conclusively disabling. 20 C.F.R. § 404.1520(a)(4); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). If the answers to these questions are "yes," then the ALJ should find that the claimant is disabled. *Id.*

At times, an ALJ may find that the claimant is unemployed and has a serious impairment, but that the impairment is neither listed in nor equivalent to the impairments in the regulations—failing at step three. If this happens, then the ALJ must ask a fourth question: (4) whether the claimant is able to perform his or her previous work. *Id.* If the claimant is not able to, then the burden shifts to the Commissioner to answer a fifth and final question: (5) whether the claimant is capable of performing *any* work within the economy, in light of the claimant's age, education, and work experience. If the claimant cannot, then the ALJ should find the claimant to be disabled. *Id.*; *see also Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

A claimant may appeal the final decision of the Social Security Administration to this Court, but the scope of review here is limited: while the Court must ensure that the ALJ did not make any errors of law, the ALJ's findings of fact are conclusive as long as they are supported

---

SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable person would find sufficient to support a decision. *Weatherbee*, 649 F.3d at 568 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The Court takes into account the entire administrative record when reviewing for substantial evidence, but it does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). But even though this judicial review is limited, the Court should not and does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

## The ALJ's Decision

ALJ Scurry found plaintiff met the insured status requirements through June 30, 2014, and had not engaged in substantial gainful activity since the alleged onset date of June 1, 2005. (Tr. 1107-08.) Plaintiff had severe impairments of fibromyalgia, degenerative disc disease of the lumbar and cervical spine, depression, anxiety, and obsessive-compulsive disorder. (Tr. 1108.)

Prior to June 6, 2016, plaintiff had the residual functional capacity (RFC) to perform light work with several exceptions. There were jobs in the national economy that plaintiff could have performed. (Tr. 1111, 1122.) On June 6, 2016, plaintiff had the RFC to perform light work with more severe restrictions, which prevented her from performing any jobs that existed in the national economy. (Tr. 1120, 1123.) Thus, plaintiff was not disabled prior to June 6, 2016, but became disabled on June 6, 2016. (Tr. 1123.)

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised

by plaintiff.

### 1. Agency Forms

Plaintiff updated her agency forms in 2015. She indicated that mental issues and back and neck problems limited her ability to work. Plaintiff's highest degree of education was twelfth grade. She worked as a bookkeeper at a roofing company, a clerk in a retail store, a pharmacy technician at a prison, a secretary at a vet office, and a tutor at a writing center. (Tr. 1496-97.)

Plaintiff took Abilify, Clonazepam, and Lexapro for her "mood"; Adderall for attention deficit disorder; Albuterol for breathing difficulties; Vicodin for pain; and Xyzal for allergies. (Tr. 1499.)

Plaintiff stated she had limited use of her right hand, which made it difficult to write, type, use a mouse, and grip objects. She had very high absenteeism due to doctor appointments, agoraphobia, chronic pain, and panic attacks. She could not stand, walk, lift, bend, twist, or sit for "any real period of time." Chronic pain and muscle spasms from fibromyalgia and neck and back conditions made plaintiff sore after performing any kind of physical activity. She was often unable to get out of bed. (Tr. 1506.)

Plaintiff experienced pain in her right hand, right arm, neck, joints, and back; random flu-like symptoms; depression; anxiety; agoraphobia; trichotillomania; feelings of doom; and panic attacks. She also had episodes of psychosis during which she lost all rational thought and cried uncontrollably for hours. She was suicidal during these episodes; she twice branded herself with a wood-burning tool and once cut herself. She had no memory of these occurrences. (Tr. 1514-16.) Plaintiff underwent electroconvulsive therapy that resulted in serious short- and long-term memory loss. (Tr. 1567.)

5

Plaintiff sometimes woke up every couple of hours due to pain and muscle spasms. She could not work the next day because of exhaustion. (Tr. 1508.)

Plaintiff used a neck brace since surgery in March 2011 and a back brace since surgery in April 2012. (Tr. 1516.)

On most days, plaintiff had coffee in the morning and let her dogs outside. She sat for about twenty minutes with a heating pad on her lower back. On a good day, she did some light housework and bathed or ran errands. About two to three times per week, plaintiff performed physical therapy exercises and/or visited friends and family. She sometimes worked for about ten minutes in the yard. Most evenings, plaintiff fed her pets and made herself dinner before going to bed. She enjoyed reading during down time. On a bad day, plaintiff would just let her dogs outside then go back to bed. She would not bathe or eat and would lie in bed all day napping and crying. On a "random day," plaintiff tended to her pets, bathed, and left the house. She started her day with the intention of being productive but would have a panic attack that would make her go to sleep or lock herself in her home. (Tr. 1508.)

Plaintiff could not shop alone. She could not play sports or exercise. Plaintiff could not grip objects and therefore could not open cans or bottles, cook, push mow, vacuum, pull weeds, sew, write, paint, use a keyboard or calculator, apply makeup, style her hair, or use hand tools. She was unable to clean her home or vehicle as she used to; she could not mop, lift more than five pounds, or bend over to scrub tubs and dishes. She was unable to take her dogs for a walk or bend over to bathe them. (Tr. 1508-10.)

Plaintiff had panic attacks 95% of the time she shopped. She could not retrieve or read her mail because of anxiety. There were times when plaintiff was so sad that she laid in bed and cried for days at a time. Her concentration wavered such that she was unable to remember to

6

perform day-to-day activities such as feeding her pets and bathing. She often missed appointments due to an overwhelming fear of leaving her home. She could not organize or prioritize tasks and became very agitated and anxious when faced with everyday problems and situations. (Tr. 1509.)

Plaintiff was able to feed her animals, give them medications, let them outside, and clean their litter boxes. She could cook meals like frozen dinners, sandwiches, and cereal. Plaintiff could do laundry, dishes, some dusting, and clean her toilet. She tried to fill birdfeeders and garden ten minutes per day. (Tr. 1510.)

Plaintiff needed reminders to eat and bathe. She also needed someone to tell her when her behavior was strange or illogical so she could make sure she took her medication. (Tr. 1510.)

Plaintiff's hobbies included reading, watching birds, "pets," and communicating online. She tried to read every day. (Tr. 1512.)

### 2. Medical Records

Plaintiff received treatment for pain in her neck and back beginning in October 2007. She treated with a chiropractor, her primary care physician, a neurosurgeon, and a rheumatologist. (Tr. 1287, 1289.)

In 2010, an MRI demonstrated a moderate central bulge of the C4/5 disc and a minimal central bulge of the C5/6 and C6/7 discs. Arthritic changes were also seen at L3/4 and L4/5 facets. (Tr. 1287.)

Plaintiff began receiving steroid injections in April 2010. She also underwent microdiscectomies in February 2011 and April 2012. She participated in physical therapy in 2011 and 2012. (Tr. 1287-88.)

Plaintiff complained of anxiety and depression beginning in October 2004. She took Buspar, Xanax, and Lexapro but claimed her symptoms persisted. She was hospitalized for a month in June 2008 for depression and again in August 2008 after a suicide attempt. (Tr. 1289.)

During plaintiff's hospitalization, she received psychiatric care from Dr. Simeon Grater. She continued to treat with Dr. Grater after her release and saw him on over twenty occasions from October 2008 through April 2012. (Tr. 479-531, 839.) Dr. Grater diagnosed plaintiff with severe recurrent major depression and anxiety disorder. (Tr. 1289.) He prescribed plaintiff a combination of Wellbutrin, Clonazepam, Adderall, Lexapro, and Fluoxetine. (Tr. 483, 489.)

Dr. Grater completed a mental RFC assessment of plaintiff in November 2011. He opined she had mild limitations in her ability to sustain an ordinary routine without special supervision, make simple work-related decisions, and ask simple questions or request assistance. He opined plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, work in coordination with or proximity to other without being distracted by them, interact appropriately with the general public, maintain social appropriate behavior and adhere to basic standards of neatness and cleanliness, and set realistic goals or make plans independently of others. (Tr. 742-44.)

Dr. Grater further opined plaintiff had marked limitations in her ability to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond appropriately to changes in the work setting. (Tr. 743-44.)

Dr. Grater found plaintiff had extreme limitations in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruption from psychologically based

symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and travel in unfamiliar places or us public transportation. (Tr. 743-44.)

## Analysis

Plaintiff argues the ALJ improperly weighed the opinions of her treating psychiatrist, Dr. Grater. The Social Security Regulations require an ALJ to afford controlling weight to a treating source's opinion, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527. Otherwise, the ALJ must identify "good reasons" for rejecting the opinion and assess it against the following factors: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; and (5) the physician's specialization. *Id.*

Dr. Grater completed a mental RFC assessment of plaintiff and opined she had several extreme and marked limitations in her ability to perform work-related tasks. The ALJ afforded Dr. Grater's opinions "little weight" because they were inconsistent with the overall evidence of record. Specifically, the ALJ called into question the opinions because Dr. Grater determined plaintiff had marked limitations in interacting appropriately with others but treatment records showed plaintiff was "cooperative with good eye contact" and demonstrated "appropriate behavior[] and a normal mood and affect" during examinations. (Tr. 1117.) The ALJ also opined, "Dr. Grater's assessed serious limitations in completing tasks is not consistent with evidence that the claimant was often alert and oriented with logical thought processes, intact concentration, and a good fund of knowledge." *Id.* Plaintiff asserts the ALJ presented a slanted version of the evidence and erroneously omitted portions of the record that support Dr. Grater's assessment.

9

An ALJ is only required to "minimally articulate" his reasoning for discounting the opinion of a treating physician—"a very deferential standard that [the Seventh Circuit has], in fact, deemed lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Thus, an ALJ "is not required to address every piece of evidence or testimony," *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), so long as she does not "ignore an entire line of evidence that is contrary to her findings," *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

Here, ALJ Scurry acknowledged that plaintiff was hospitalized for psychological issues and received diagnoses of depression, obsessive-compulsive disorder, anxiety disorder, and panic disorder on several occasions. ALJ Scurry noted treatment records that stated plaintiff appeared withdrawn and had soft speech in March 2007; a blunted and restricted affect in October 2008; a dysthymic mood and passive suicidal ideation in June 2012; and a decreased ability to concentrate with tangential thought processes in June 2013. The ALJ also wrote, "From March to November 2009, mental status examinations indicated an anxious and depressed mood and a restricted affect. . . ." The ALJ noted that in October 2013, plaintiff was hospitalized for cutting her arms and appeared subdued, depressed, and anxious with poor insight and severely impaired judgment. (Tr. 1114.) Later in his opinion, ALJ Scurry stated, "[A]t times, she was anxious, depressed and irritable, with a withdrawn and restricted affect. . . . [A]t times, she had preoccupied thought processes, impaired concentration, and poor insight and judgment." (Tr. 1117.)

Although the ALJ may not have noted all of the evidence consistent with Dr. Grater's opinion, he did not ignore an entire line of evidence contrary to his ruling. As evidenced above, ALJ Scurry addressed numerous portions of the record that bolster Dr. Grater's assessment. However, the ALJ also identified several instances where plaintiff was cooperative and

10

demonstrated appropriate behavior and judgment. (Tr. 1117.) The regulations task the ALJ, and not this Court, with resolving evidentiary conflicts in the record. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (the court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner.") Substantial evidence therefore supports ALJ Scurry's conclusion that Dr. Grater's assessment was inconsistent with substantial evidence in the record.

The ALJ's analysis, however, does not end there. After finding that a treating physician's opinion is not entitled to controlling weight, the ALJ must determine what weight to afford the opinion after considering the factors in 20 C.F.R. § 404.1527. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014).

ALJ Scurry's opinion does not indicate he considered the factors—i.e. the length of the treatment relationship; the nature and extent of the treatment relationship; the consistency and supportability of Dr. Grater's opinion; and Dr. Grater's specialization. Moreover, many of these factors are favorable to the credibility of Dr. Grater's opinions. Plaintiff treated with Dr. Grater on over twenty occasions from 2008 to 2012; Dr. Grater specialized in psychiatry; Dr. Grater conducted in-person therapy sessions; and Dr. Grater utilized the Burns Anxiety Inventory and Burns Depression Checklist to assess plaintiff's symptoms.

Because it is unclear whether the ALJ considered the checklist factors from the regulations, the Court cannot determine whether substantial evidence supports the ALJ's decision to give Dr. Grater's opinion little weight. The ALJ's decision must be reversed and remanded for reconsideration.

On remand, the ALJ should clearly apply the two-step process for weighing a treating source opinion. The ALJ should first determine whether the treating physician's opinion is

11

entitled to controlling weight in light of consistency and supportability and, if not, continue to assess the opinion against the checklist factors. "These steps are separate and distinct; ALJs are not permitted to conflate them." *Williams v. Berryhill*, No. 17 C 1936, 2018 WL 264201, at *3 (N.D. Ill. Jan. 2, 2018.)

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of Court is **DIRECTED** to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE: April 2, 2018**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**